NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Criminal No. 10-00714 (JAP) |
| v. | **OPINION** |
| MARK HOLZWANGER and ANDREW MUHLSTOCK, | |
| Defendants. | |

PISANO, District Judge.

The October 21, 2010 Indictment in this criminal case charged Defendants Mark Holzwanger, Andrew Muhlstock, Russell Speranza and Stephen Guthartz with three counts of wire fraud in violation of 18 U.S.C. § 1343. Russell Speranza and Stephen Guthartz entered into plea agreements with the Government on June 30, 2011, and July 27, 2011, respectively. A jury trial was held as to the remaining Defendants, Mark Holzwanger and Andrew Muhlstock, from August 8, 2011 to August 29, 2011. Defendants Holzwanger and Muhlstock moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) on August 19, 2011 [docket entries no. 112, 114]. The Court reserved decision on this Motion. Trial Tr. 1487:12-22, August 19, 2011. On August 29, 2011, the jury returned a verdict of guilty on two counts of wire fraud and not-guilty on the third for Defendant Holzwanger [docket entry no. 132]. As to Defendant Muhlstock, the jury was deadlocked [docket entry no. 133]. On September 14, 2011, Defendant Mark Holzwanger moved for a new trial pursuant to Federal Rule of Criminal

Procedure 33 [docket entry no. 140]. The Government opposed the Rule 29 and Rule 33 Motions [docket entry no. 141]. For the reasons set forth herein, the Rule 29 Motion will be granted as to Defendants Muhlstock and Holzwanger. The Court need not reach the Rule 33 standard.

I.  **FACTUAL BACKGROUND**

The Moving Defendants, Guthartz and Speranza (together, "Defendants") owned or operated a now-bankrupt payroll services company called Total Time Solutions ("TTS") between January 2002 and November 2005. Pursuant to contracts with its clients, TTS withdrew funds from clients' bank accounts equal to the amount of their payroll and tax liabilities, plus TTS fees. These funds were kept by TTS in a comingled account that was also used to pay the company's operating expenses, which is standard practice in the payroll services industry. On November 1, 2005, TTS, which then had outstanding liabilities of approximately $3.5 million, was sold to a company called Ingentra for $5,000.

On October 21, 2010, the Defendants were charged by Indictment No. 10-714 with wire fraud under 18 U.S.C. § 1343. The Indictment charged the Defendants with engaging in a scheme to defraud the clients of TTS between 2002 and 2005. The Indictment described a scheme in which the Defendants fraudulently induced clients of TTS to allow money to be withdrawn from their bank accounts purportedly to be paid over to the Internal Revenue Service ("IRS") for the clients' payroll taxes, but instead used that money to pay the operating expenses of TTS. Indictment ¶ 6. Defendants Muhlstock and Holzwanger were charged as "partner[s] and member[s]" in both TTS and in their own accounting firm which was also a "partner and

member" of TTS. *Id.* ¶ 1. Defendant Guthartz was charged as a partner, member, and employee of TTS, and Defendant Speranza was charged as an employee of TTS. *Id.*

According to the Indictment, clients of TTS were told that money withdrawn from their bank accounts would be used to pay those clients' payroll taxes when due. *Id.* ¶ 7(d). Instead, money withdrawn from TTS clients' bank accounts was used to pay the operating expenses of TTS and the payroll taxes of other TTS clients. *Id.* ¶¶ 6 and 7(e). It was part of the scheme that when a TTS client received notice from the IRS regarding the late payment or non-payment of payroll taxes, that client was not informed that the money withdrawn from its bank account had not been paid over to the IRS. *Id.* ¶ 7(i). The Indictment also alleged that the Defendants concealed the late payment and non-payment of payroll taxes by submitting false reports to clients of TTS and false payroll tax forms to the IRS. *Id.* ¶¶ 7(f) - (h).

## II.  LEGAL STANDARD AND DISCUSSION

Pursuant to the Federal Rules of Criminal Procedure, if a jury returns a guilty verdict against a defendant, a court may set aside that verdict and enter an acquittal. Fed. R. Crim. P. 29(c). The Court applies "a 'particularly deferential' standard of review to a challenge to the sufficiency of evidence supporting a jury verdict." *United States v. Peppers,* 302 F.3d 120, 125 (3d Cir. 2002) (quoting *United States v. Dent*, 149 F.3d 180, 187 (3d Cir. 1998)). In considering a motion for acquittal pursuant to Rule 29(c), the Court must "determine whether the evidence submitted at trial, 'when viewed in the light most favorable to the government, would allow a rational trier of fact to convict.'" *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001) (quoting *United States v. Helbling*, 209 F.3d 226, 238 (3d Cir. 2000). The Court "must sustain the verdict if any trier of fact could have found the essential elements of the crime beyond a

reasonable doubt." *United States v. Basley*, 357 Fed. Appx. 455, 459 (3d Cir. 2009) (citing United States v. Cunningham, 517 F.3d 175, 177 (3d Cir. 2008)). A finding of insufficiency should be reserved for those situations in which "the prosecution's failure is clear." *United States v. Mercado*, 610 F.3d 841, 845 (3d Cir. 2010).

If the Motion is made before the close of all the evidence, the Court may reserve decision. Fed. R. Crim. P. 29(b). The Motion must be decided according to when the ruling was reserved. *Id.* Thus, the Court's decision must be based entirely on the sufficiency of the evidence presented by the Government. *United States v. Mitchell*, 350 Fed. Appx. 763, 766 (3d Cir. 2009) (citing *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). While this includes evidence elicited on cross-examination of government witnesses, it does not include evidence presented in the defense case. *Brodie*, 403 F.3d at 133.

In their Rule 29 Motion, Muhlstock and Holzwanger argue that the Government presented no evidence of any intent to deceive, no evidence that the Defendants personally embezzled any client funds, no evidence that TTS was not principally a legitimate payroll business, and no evidence that the three wire transfers forming the basis of the wire fraud counts were themselves part of a scheme to defraud. The Defendants further argue that the Government constructively amended or prejudicially varied from the Indictment, which alleges that the scheme began at the time the business itself started, by failing to offer any evidence that the business was conceived as fraudulent. The two arguments the Court finds most compelling for the purposes of this Motion relate to the variance from the Indictment, and the dearth of evidence suggesting that Holzwanger and Muhlstock had the requisite specific intent to defraud.

A. <u>**The Wire Fraud Statute**</u>

The federal wire fraud statute prohibits the use of electronic transmissions to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. "To prove . . . wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of . . . interstate wire communications in furtherance of the scheme." *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (internal quotation omitted). The charged wire transfer must be "sufficiently closely related to respondent's scheme to bring his conduct within the statute." *United States v. Cross*, 128 F.3d 145, 150 (3d Cir. 1997) (quoting *United States v. Tarnopol*, 561 F.2d 466, 471 (3d Cir. 1977)). The Third Circuit has broadly defined a "scheme to defraud" as any effort at deceit which aims, in part, to deprive another of money or property. *Hedaithy,* 392 F.3d at 590-91. The object of the scheme to defraud must be a "traditionally recognized property right." *United States v. Cross*, 128 F.3d 145, 150 (3d Cir. 1997) (citing *United States v. Henry,* 29 F.3d 112, 115 (3d Cir. 1994)).

Where the fraud is perpetrated through a business entity, courts distinguish between wire transfers made in the course of a wholly fraudulent business, and those made in the course of a largely legitimate business that has been used to commit criminal acts. Where the business is wholly illegitimate, all wire transfers are effectively "in furtherance of the scheme." *Hedaithy*, 392 F.3d at 590; *United States v. Dobson*, 419 F.3d 231, 241 (3d Cir. 2005). Where, however, a primarily legitimate business is used to commit criminal acts, the wire transfers charged must be "part of the execution of the fraud" to come within the ambit of the wire fraud statute. *Cross*, 128 F.3d at 150. Thus, "routine mailings, themselves intrinsically innocent, which are regularly

employed to carry out a necessary or convenient procedure of a legitimate business enterprise" will not support a wire fraud conviction. *United States v. Tarnopol*, 561 F.2d 466, 472 (3d Cir. 1977).

### B. <u>Prejudicial Variance from the Indictment</u>

The Moving Defendants argue that the Government constructively amended or varied from the Indictment. They argue that the Indictment charges that TTS was an entirely fraudulent enterprise, but that the Government only offered evidence to prove that well into the operation of TTS as a legitimate business, pre-existing clients were fraudulently induced to remain clients, and that the prospective buyer of TTS was also a target of the scheme. The Government responds to this variance argument in two ways. First, it argues that the Indictment never charged that TTS was a sham business, but rather that the terms of the Indictment clearly charge the narrower scheme that was ultimately proven. Second, and somewhat contradictorily, the Government continues to suggest that TTS was in fact an entirely fraudulent venture.

Amendment of an indictment by a court or prosecutor is a violation of a defendant's Fifth Amendment right to be charged by a grand jury. *United States v. Vosburgh,* 602 F.3d 512, 531-32 (3d Cir. 2010); *Russell v. United States*, 369 U.S. 749, 769 (1962). "An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio,* 445 F.3d 253, 259-60 (3d Cir. 2006). Constructive amendments are *per se* reversible under harmless error review, and presumptively reversible under plain error review. *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) (citing *United States v. Syme*, 276 F.3d

6

131, 136 (3d Cir. 2002)). Similar to constructive amendment, a variance occurs "where the charging terms of the indictment are not changed but when the evidence at the trial proves facts materially different from those alleged in the indictment." *Daraio*, 445 F.3d 253 at 259. For a court to vacate a conviction based on a variance, it must have been likely to surprise the defendant at trial, or have otherwise prejudiced a substantial right of the defense. *Id.* at 262; *United States v. Kemp*, 500 F.3d 257, 287 (3d Cir. 2007). The rule against variance is meant to protect the defendant's right to be informed by the indictment of the charges against him so that he may prepare for trial. *United States v. Ali Amirnazmi*, 645 F.3d 564, 592 (3d Cir. 2011) (citing *United States v. Schurr*, 775 F.2d 549, 553-54 (3d Cir. 1985)).

The failure to prove that TTS was not principally a legitimate payroll business represents a variance from the Indictment. The Court will not decide whether a *per se* reversible constructive amendment occurred in considering this Rule 29 Motion, because this would require the consideration of rebuttal summations, jury instructions, and other events that took place after the Motion was filed. However, the Court does find that the evidence presented by the government at trial created a prejudicial variance from the indictment. The government's proofs constituted a material change from the offense that was charged, not merely a shift in proof to a lesser included offense.

The Government admits in its post-trial briefs that it did not prove that TTS was conceived as fraudulent. Gov't Opp. to Mot. 50. However, the Government urges the Court that its proofs were consistent with the Indictment, because the Indictment clearly charges the narrower scheme which was ultimately proven. *Id.* at 50-51. This not a sensible reading of the Indictment. It is not, as the Government argues, "coincidental" that the Indictment describes the fraudulent scheme as lasting for exactly the same time period as the business itself. *Id.* at 50.

The Indictment could have alleged that the scheme began later, when TTS began to pay some of its clients' taxes late—under the narrower theory of the scheme, this would be roughly equivalent to the time that TTS began to fraudulently induce pre-existing TTS clients to stay with TTS. By instead alleging that the scheme began when the business itself began, and that it consisted of inducing "clients to give TTS permission to withdraw money from clients' bank accounts," Indictment ¶ 7(a), the Indictment alleges that Defendants fraudulently induced businesses to become TTS clients in the first instance. The Indictment also charges the Defendants with "fraudulently increasing the value of TTS," *id.* at ¶ 6, and the Government continues to argue that the Defendants deliberately undercapitalized the business with the intent of defrauding clients. These allegations amount to the charge that TTS was an entirely fraudulent venture.

The Government argues that, if it had meant to charge that TTS was entirely fraudulent, it would have clearly done so in the Indictment. Not only does the Indictment effectively charge that TTS was utterly fraudulent as described above, but this argument works both ways: the Indictment could have clearly charged that the fraudulent scheme was implemented through an otherwise legitimate business. It did not.

The difference between these two theories is significant. The Supreme Court in *United States v. Miller* distinguished cases where "the indictment failed to charge the offense for which [defendant] was convicted" and those where there was no variance because the indictment merely "charged more than was necessary." 471 U.S. 130, 140 (1985). *See also Salinger v. United States*, 272 U.S. 542, 548-49 (1926) (holding no violation of the defendant's right to a grand jury where the district court submitted to the jury only one of several fraudulent schemes charged in the indictment); *Turner v. United States*, 396 U.S. 398, 420 (1970) ("[W]hen a jury

returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."). This case falls into the former category, as the indictment did not simply allege "more crimes or other means of communicating the same crime," *Miller*, 471 U.S. at 136, but rather an entirely different type of fraudulent scheme. "[T]he 'key inquiry is whether the defendant was convicted of the same conduct for which he was indicted.'" *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) (quoting *Daraio*, 445 F.3d at 260).

As described above, courts recognize a distinction in the proofs required between the prosecution of entirely fraudulent businesses and the prosecution of primarily legitimate businesses that are used to perpetrate fraudulent schemes. *Hedaithy*, 392 F.3d at 590; *Cross*, 128 F.3d at 150; *Tarnopol*, 561 F.2d at 471-72; *Dobson*, 419 F.3d at 241. In the case of an entirely fraudulent venture, all wire transfers made in the course of the business would be part of the scheme, and defendants would more likely be "willful and knowing" participants in the scheme merely by virtue of having a significant involvement in the business. Where the business was not entirely a sham but was used to perpetrate a fraud, however, the Government must prove that the specific wires charged were somehow related to "the execution of the fraud." *Cross*, 128 F.3d at 150. It also must prove that the defendants in some way perpetrated the scheme, as it is unreasonable to infer a specific intent to defraud merely from the fact that defendants had an interest in a primarily legitimate business. These involve different factual proofs and therefore different defenses. That the defense case had been tailored to the charge that TTS was utterly fraudulent is evident from the opening statements and the cross-examinations, which emphasized the legitimate nature of the business as a whole.

Not only is such a variance likely to prejudice the defendants' ability to prepare for trial, but the variance in this case created a strong likelihood of juror confusion. The Court finds instructive cases holding that the government prejudicially varied from the indictment by charging a single large conspiracy, but then offering proof of multiple disparate conspiracies. In *Kotteakos v. United States*, the Supreme Court held that the defendants had a substantial right "not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others. . . ." 328 U.S. 750, 775 (1946). *See also United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982) ("[E]ven if there had been sufficient evidence to convict any one of the defendants on a single scheme, the volume and manner of presentation of the evidence created the likelihood of spillover: i.e., that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another."); *Kemp*, 500 F.3d at 287 ("There is a variance if the indictment charges a single conspiracy while the evidence presented at trial proves only the existence of multiple conspiracies.").[1]

Although Holzwanger and Muhlstock were tried for fraud and not conspiracy, the potential for a spillover effect from evidence presented for distinct offenses is present here as well. The Government failed to adduce any evidence that TTS was conceived as a fraudulent business, or even that it was converted at some point during its operation from a legitimate venture into an entirely fraudulent one. However, the government did present evidence of wrongdoing by TTS and by individual defendants other than Holzwanger and Muhlstock, as well as evidence of the entirely different offense of tax fraud. Because the prosecution began with the unproven theory that the entire business was fraudulent, it created an aura of vicarious liability that could have affected the jury. If the Indictment had clearly charged that the scheme was

---

[1] Notably, the Third Circuit held that the appropriate remedy for such a variance was acquittal rather than retrial. *United States v. Camiel*, 689 F.2d 31, 39 (3d Cir. 1982).

implemented through an otherwise legitimate business, it would have been much clearer to the jury that the Defendants must each have been directly connected to the fraudulent misrepresentations to be proven guilty. It also would have been clearer to the jury that the charged wires must be related to the scheme, and not merely related to the business at large. Instead, the variance affected the nature of the evidence presented and increased the possibility of juror confusion. Juror confusion is particularly evident in the case against Muhlstock, for whom the jury was unable to return any verdict at all.

Juror confusion may also have been exacerbated by an error that appeared in the Indictment. The Indictment alleged that Defendants misrepresented the extent of the operating shortfall in the financial documents it provided to Ingentra in connection with the sale of TTS in late 2005. However, the defense showed that the Government erred in the Indictment by attaching an earlier financial document than the one that was, in fact, attached to the sale agreement. The defense also showed that Ingentra was not misled as to the financial condition of TTS, and that the deficit in client taxes due was accurately factored into the sale price of $5,000.

In contrast to the above-described argument that the Indictment did not charge that TTS was entirely fraudulent, the Government also attempts to resuscitate the theory that it was. In its opposition to the Rule 29 and Rule 33 Motions, the Government continues to argue that other aspects of the business aside from the late tax payments, such as an operating deficit, demonstrate a fraudulent intent much earlier than 2004. The Government's contention that the business was deliberately undercapitalized so that the Defendants would not have to "risk their own money," Gov't Opp. to Mot. 51, is consistent with the theory that the business itself was fraudulent. The Defendants, however, produced evidence that operating deficits were ordinary

in the industry, and correctly note in their Rule 29 Motion that there was no evidence of any late tax payments or misrepresentations to clients until 2004 at the earliest.

Even if these practices were not ordinary, they at most point to mismanagement and are insufficient to show a specific intent to defraud TTS clients.  They are particularly weak for the purpose of showing specific intent on the parts of Holzwanger and Muhlstock, as much evidence showed that the Moving Defendants were not very involved in the day-to-day operations of TTS, and that they had no expertise in the payroll industry.  Rather, the evidence suggests that Holzwanger and Muhlstock spent most of their time on their accounting practice—which was a client of TTS itself.  Furthermore, the defense elicited much testimony strongly suggesting that former TTS President and CEO Steven Reiger was largely responsible for any such mismanagement.  Uncontroverted testimony from various witnesses showed that Reiger was heavily relied upon as an expert in the industry, but ultimately ejected from the company for malfeasance by the Defendants themselves.  The lack of evidence demonstrating Holzwanger and Muhlstock's specific intent to defraud is described further below.

### C. Insufficient Evidence Connecting Moving Defendants or Charged Wires to the Scheme

The conclusion that the variance was prejudicial is bolstered by the dearth of evidence showing that the scheme was related either to the charged wires or to the Moving Defendants.  According to the prosecution, the fraud was accomplished by the implicit false representation that all client taxes had thus far been paid on time, and one affirmative misrepresentation that any late payments had been due to a software glitch.  However, there was scant evidence allowing a reasonable jury to conclude that the charged wires were related to the scheme, or to infer a specific intent to defraud on the parts of Holzwanger and Muhlstock.  This further

supports the Court's conclusion that the variance created juror confusion as to the necessary element of specific intent by introducing an aura of vicarious liability.

The three charged transfers took place in October 2005, right before the sale of TTS to Ingentra. The Government points to the testimony of the three clients who originated the transfers of funds that form the basis for the wire fraud counts, noting that all three clients stated that they would never have made these transfers had they known their taxes were not being paid on time. Thus, the Government argues, the transfers constituted the "fruit" of their fraudulent scheme. Gov't Opp. to Mot. 40-41. The Government analogizes this scenario to *United States v. Tiller*, 302 F.3d 98 (3d Cir. 2002), in which a defendant was convicted of mail fraud for falsely representing to her employer that she had visited workers compensation claimants as required in the course of her employment. The mailings at issue were the bills and payments exchanged between her employer and the third-party claimants who were billed for visits that never took place. *Id.* at 103.

Unlike the situation in *Tiller*, however, the Government has not proven that the clients were intentionally defrauded of the money that was sent to TTS in the three charged wire transfers. The Government presented no evidence that the taxes or payrolls of these three clients had not been paid on time before November 1, 2005, the date TTS was sold to Ingentra. Nor was there any evidence showing that the Defendants had any intention of making late payments on behalf of these clients. In fact, the evidence showed just the opposite. Defendants were engaged in efforts to find investors or sell the company in order to infuse it with the capital necessary to stay in business by, among other things, continuing to pay client taxes. The Government failed to connect any of the three wire transfers to a narrower scheme, and now essentially argues that all client funds were fraudulently obtained by the Defendants. No rational jury could conclude

that the three wire transfers were "incident to an essential part of the scheme," *Schmuck*, 489 U.S. at 710, without relying on the unproven theory that the entire business was a sham.

In order to succeed on this narrower fraudulent inducement theory, the Government would also need to prove that the Defendants themselves made false representations to the clients. The Government has not proven its contention that Holzwanger and Muhlstock "caused TTS clients to be lied to and falsely reassured so that they could use the clients' money to buy time" beyond a reasonable doubt. Opp. to Mot. 17. The Government offered no evidence that these two Defendants personally lied to any TTS clients in order to defraud them of their money. Rather, it relies on a theory of implicit misrepresentation by the Defendants, and attempts to hold Defendants responsible for the few affirmative misrepresentations in the record.

First, the Government essentially argues that the Defendants had a duty to inform all of their clients that the taxes of a subset of these clients had recently been paid late. Whether or not the discharging of such a duty might have led to an exodus of TTS customers, the failure to do so does not amount to a *specific intent to defraud* on the part of these Defendants. The evidence tended to show, rather, that the Defendants became aware of late tax payments and client complaints in 2004 at the earliest, and were engaged in ultimately unsuccessful efforts to find investors or sell the business in order to infuse it with capital to resolve the problem.

The only affirmative misrepresentations offered by the Government were the "Dear Valued Client" letter of July 2005, and the payroll reports and falsified tax documents which, the Government argues, constituted an indirect way of communicating to clients that their payrolls and taxes were being paid on time. The July 2005 letter falsely represented that late tax payments had occurred due to a software error. The Government presented some evidence—the testimony of cooperating witness Speranza—that Holzwanger and Muhlstock knew about and

approved of the July 2005 letter and falsifying of tax documents.  While other witnesses were able to testify to conversations with Holzwanger and Muhlstock about late tax payments and client complaints, Speranza's testimony about their awareness or approval of these misrepresentations was uncorroborated.  His credibility as a witness was also severely called into question.  While it is for the jury and not the Court to weigh issues of credibility, the thorough impeachment of Speranza is another factor weakening the evidence of specific intent and thereby confirming the Court's finding that the variance was prejudicial.

If the Government had proven that TTS was entirely fraudulent, then all wire transfers made in the course of the business would have been part of the scheme.  Similarly, any evidence of the Defendants' day-to-day involvement in TTS would have made it much more likely that they were knowing participants in that entirely fraudulent business.  However, in light of the Government's failure to prove that TTS itself was fraudulent, the evidence connecting a narrower scheme with the Defendants and with the charged wires was extremely weak.  The weakness of this evidence confirms the Court's conclusion that the defense was compromised by the variance from the Indictment.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the prosecution offered insufficient evidence to allow a rational jury to conclude beyond a reasonable doubt that Defendants Holzwanger and Muhlstock engaged in the fraudulent scheme charged in the Indictment.  Evidence offered to prove an alternative scheme constituted a prejudicial variance from the Indictment.  The weak nature of the evidence offered to prove the alternative scheme substantiates the Court's conclusion that the variance prejudiced the Defendant's ability to

prepare for trial and created juror confusion. In light of the jury's conviction of Holzwanger and inability to reach a verdict for Muhlstock, the Court shall vacate Holzwanger's conviction and enter an acquittal for both Defendants.

        /s/ Joel A. Pisano_____
JOEL A. PISANO
United States District Judge

Dated: March 8, 2012